UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CIV-62404-RAR

DEVONA STEVENSON,

      Plaintiff,

v.

CITY OF SUNRISE,

      Defendant.

_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Devona Stevenson claims that Defendant City of Sunrise ("City") discriminated against her on the basis of her race and sex when it (1) chose not to assign her trainees as part of the City's field training program and (2) singled her out for taking bathroom breaks. Stevenson also alleges that the City retaliated against her when she complained of its discriminatory conduct. As a result, Stevenson claims she suffered lost wages and emotional damages.

This action is now before the Court upon the City's Motion for Summary Judgment [ECF No. 38] ("Motion"). In its Motion, the City asserts it is entitled to summary judgment because each of Stevenson's claims fail as a matter of law. The City avers that Stevenson cannot prove that it discriminated against her because it had legitimate, nondiscriminatory reasons for its actions and Stevenson is unable to show that those reasons were pretextual. Regarding Stevenson's retaliation claims, the City argues that Stevenson has failed to adduce any evidence from which a reasonable jury could find in her favor.

The Court has carefully reviewed the Motion, Stevenson's Response in Opposition to the Motion [ECF No. 45] ("Response"), the City's Reply in Support of its Motion [ECF No. 49] ("Reply"), and all the record evidence. Being otherwise fully advised in the premises, it is hereby

**ORDERED AND ADJUDGED** that the Motion [ECF No. 38] is **GRANTED** as set forth herein.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, a final judgment will be entered by separate order.

## BACKGROUND

The City implements a program where officers are selected as "Field Training Officers" ("FTO") to train and evaluate incoming trainees.  Def's. Statement of Material Facts [ECF No. 39], Pl's. Resp. to Def's. Statement of Material Facts [ECF No. 46] (collectively, "Def's. SOMF") ¶ 4.  The selection process is governed by the City's Policies and Procedures Manual.  *See* Sunrise Police Department Policies and Procedures Manual [ECF No. 40-2] ("City's Policy").  During the relevant time period, Sergeant Louis Castro oversaw the City's FTO training program and worked in conjunction with Lieutenant Sean Visners, Major Robert Voss, and Lieutenant Paul Katz to make decisions regarding the program.  Decl. of Luis Castro [ECF No. 40-3] ("Castro Dec.") ¶¶ 4, 9.  To be eligible for the FTO position, officers must first attend and complete a state-certified FTO training program.  Def's. SOMF ¶ 5.  And if selected by the City, FTOs receive additional pay when they are assigned trainees.  Pl's. Resp. to Def's. SOMF ¶ 31.

Stevenson is a black female policer officer employed by the City for over 20 years.  Def's. SOMF ¶ 1; Pl's. Additional Statement of Material Facts [ECF No. 46][1] ("Pl's. SOMF") ¶ 34.  On October 5, 2016, Stevenson wrote a memorandum to the City expressing interest in becoming an FTO.  Def's. SOMF ¶ 2.  In February 2017, Stevenson attended and completed the state-certified FTO training program with several other City police officers.  *Id.* at ¶ 8.

According to Stevenson, sometime in June and July of 2017, other officers who had completed the state-certified FTO training course were assigned trainees.  Decl. of Devona

---

[1] In its Reply, the City urges the Court to strike Stevenson's Statement of Material Facts because it exceeds the page limit authorized by Local Rule 56.1(b)(2)(D).  Reply at 1–3.  While Stevenson's Statement of Material Facts does exceed the page limit by one page, the Court exercises its discretion to allow this additional page.

Stevenson [ECF No. 46-1] ("Stevenson Dec.") ¶ 10.  Ultimately, Stevenson and two other officers were not assigned any trainees.  Def's. SOMF ¶¶ 9–11.  The only officers from Stevenson's training class to be assigned trainees were white and Hispanic males.  Pl's Resp. to Def's. SOMF ¶ 11.

Stevenson allegedly asked Lieutenant Visners why she was not assigned trainees and was told that she was not completing enough traffic stops.  *See* Devona Stevenson Dep. [ECF No. 46-5] ("Stevenson Dep.") 54:21–25, 55:1–2; Pl's. SOMF ¶ 50.  However, the City avers that Stevenson "did not receive trainees because of her significant disciplinary history and internal affairs history, apathetic attitude, consistent utilization of sick time, concerns regarding reliability and accountability, and because she did not possess as strong of a work ethic as other eligible officers."  Def's. SOMF ¶ 12.  In fact, Stevenson received an overall "satisfactory" rating on her performance evaluation for 2016-2017 in part because her supervisor noticed Stevenson was not efficient and had received "complaints from other officers regarding [Stevenson's] availability, accountability, and reliability."[2]  Def's. SOMF ¶¶ 18-19.

It is also undisputed that Stevenson has been the subject of numerous internal affairs investigations and discipline throughout her employment with the City.  *Id.* at ¶ 14.  For example, Stevenson was investigated for "failing to properly search a prisoner while making an arrest" on more than occasion.  *Id.*  Stevenson was also investigated for her involvement in a domestic dispute with her ex-husband that resulted in her arrest for battery and disorderly conduct.  *Id.* at ¶ 15.  Additionally, in May 2017, the City received a complaint from the Director of the Franklin Academy, a local school where Stevenson often participated in off-duty details, indicating concerns from parents about Stevenson's behavior.  Def's. SOMF ¶ 16.  Specifically, parents criticized Stevenson's traffic control at the school and claimed they overheard Stevenson

---

[2]  In response, Plaintiff emphasizes her "above-average" performance ratings for the years prior to her applying to become an FTO.  Pl's. SOMF ¶ 41.

complaining about the school's parents, often calling them "difficult" and "complainers."[3] *Id.* ¶ 17. At the request of Franklin Academy's Director of Operations, Stevenson was removed from these details.[4] *Id.*

Further, in September 2017, Stevenson was unable to respond to a dispatch because she was using the bathroom. *See* Stevenson Dep. at 90:22–24, 91:1–5. Lieutenant Visners questioned Stevenson about the incident and asked her to report her bathroom breaks over the radio moving forward. *Id.* at 95:15–16, 20–24. Following this discussion, Stevenson informed the City's Human Resources department that she was "being singled out and that this was discriminatory against [her] race and gender." Pl's. Resp. to Def's. SOMF ¶ 20.

On November 16, 2017, Stevenson had a panic attack during a department briefing and was transported to a local hospital for treatment, where she was diagnosed with anxiety. Def's. SOMF ¶ 20. Subsequently, Stevenson was placed on administrative leave and ordered to undergo a fitness for duty evaluation. *Id.* at ¶ 21. On November 22, 2017, Stevenson filed a formal Charge of Discrimination with the Florida Commission on Human Relations ("FCHR"), in which she alleged that the City did not assign her any trainees because of her race and sex. *Id.* at ¶ 23.

On September 20, 2018, Stevenson received an overall "satisfactory" rating on her performance evaluation for the second year in a row. *Id.* at ¶ 29. Because of this, Stevenson filed a second Charge of Discrimination with the FCHR, in which she alleged that the City retaliated

---

[3] Although Stevenson's Response to the City's Statement of Material Facts technically disputes this issue, Stevenson does not dispute that the City received the email detailing parents' complaints. Rather, Stevenson merely provides additional information unrelated to whether the City actually received this email from Franklin Academy. Thus, the Court deems this fact admitted. *See* S.D. FLA. L. R. 56.1(b) ("All material facts . . . will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record."); *see also Reyes v. Am. Sec. Ins. Co.*, No. 16-23978, 2017 WL 4225535, at *1 (S.D. Fla. Sept. 22, 2017) (finding local rule requires that a statement of disputed facts reference supporting evidence in the record and deeming facts disputed by plaintiff but not supported by record evidence as admitted); *Johnson v. Sch. Bd. of Broward Cty.,* No. 07-60797, 2008 WL 5427789, at *2-3 (S.D. Fla. Dec. 30, 2008) (same).

[4] Stevenson objected to her removal and informed her supervisor that she felt Franklin Academy's request was "discriminatory" and demanded an investigation. Pl's. Resp. to Def's. SOMF ¶ 16.

against her for filing the November 2017 Charge of Discrimination by rating her "satisfactory" and further preventing her from receiving trainees as part of the City's FTO program. *Id.* at ¶ 32.

On August 26, 2019, Stevenson filed the operative Complaint alleging eight causes of action against the City. Second Amended Complaint [ECF No. 31] ("Complaint"). Stevenson claims that the City intentionally discriminated against her on the basis of her race and sex by denying her an FTO position and by singling her out for taking bathroom breaks. Compl. ¶¶ 46, 48, 55, 57, 64, 66, 73, 75. In addition, Stevenson alleges that the City retaliated against her for complaining of such conduct. *Id.* at ¶¶ 83, 87, 93, 98. Stevenson brings her claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the Florida Civil Rights Act of 1992 ("FCRA").[5]

## **LEGAL STANDARD**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted), and "must resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990) (citation omitted). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *Chapman v. Al Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (citation omitted). And

---

[5] "Claims under the FCRA are analyzed under the same framework as claims brought under Title VII." *Rollins v. Cone Distrib., Inc.*, 710 F. App'x 814, 821 n.2 (11th Cir. 2017); *see also Forbes v. City of N. Miami*, 509 F. App'x 864, 867 (11th Cir. 2013); *Holland v. Gee*, 677 F.3d 1047, 1054 n.1 (11th Cir. 2012). Therefore, the Court will analyze Stevenson's Title VII and FCRA claims jointly.

"[a] genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Id.*

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alterations and internal quotations omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has shouldered its initial burden, the burden shifts to the non-moving party to "'set forth specific facts showing that there is a genuine issue for trial,' not just to 'rest upon the mere allegations or denials of the adverse party's pleading.'" *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (quoting *Resolution Trust Corp. v. Camp*, 965 F.2d 25, 29 (5th Cir. 1992)).

## ANALYSIS

### I. Employment Discrimination Claim

Title VII prohibits employers from discriminating against their employees on the basis of their race or gender. 42 U.S.C. § 2000e–2(a). Stevenson alleges that the City discriminated against her in two ways: (1) by not assigning her trainees after she applied to be an FTO, *see* Compl. ¶¶ 47, 65, and (2) by "singl[ing] [her] out for taking bathroom breaks." *Id.* at ¶¶ 48, 66. Neither allegation survives summary judgment.

#### A. McDonnell Douglas Applies

As a threshold matter, the parties dispute whether *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) controls this analysis. Resp. at 2–5. The parties agree that *McDonnell Douglas* applies only to single-motive cases. Reply at 3–4; Resp. at 4 ("The City . . . applied McDonnell Douglas, *which is only appropriate in single-motive cases*[.]") (emphasis added). According to Stevenson, however, she brings a mixed-motive case and therefore, the applicable standard is the

mixed-motive framework adopted in *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016). But, as the City correctly points out, "[a] mixed motive case is one where *both legitimate and illegitimate reasons* motivated the employer's adverse employment decision." Reply at 3 n.4 (emphasis in original) (quoting *Williams v. Fla. Atl. Univ.*, No. 15-60621, 2017 WL 1881676, at *4 (S.D. Fla. May 9, 2017), *aff'd*, 728 F. App'x 996 (11th Cir. 2018)).

Here, Stevenson identifies only *illegitimate* reasons for the City's decision—her race and her sex.[6] *See, e.g.*, Compl. ¶¶ 47, 49, 65 ("Plaintiff was qualified for the FTO position and *because of her race*, she was kept from receiving the benefits of the position . . . . Plaintiff was singled out *solely because she is a black female* . . . . Plaintiff was qualified for the FTO position and was *only* prevented from receiving the benefits of the position *because of her gender*.") (emphasis added). Thus, Stevenson's case is not a mixed-motive case and the *McDonnell Douglas* framework applies to her discrimination claims. *See Vestavia Hills Bd. of Educ.*, 791 F. App'x at 131 (holding *McDonnell Douglas* to be the appropriate standard where the plaintiff "did not plead or prove a mixed-motive case" and did "not suggest that unlawful bias, in addition to other factors, motivated the adverse actions").

When evaluating a claim for employment discrimination that, as here, "is based on circumstantial evidence, as opposed to direct evidence[,]" courts use the Supreme Court's "familiar three-part framework" set forth in *McDonnell Douglas. See Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013). The plaintiff "bears the initial burden of establishing a *prima facie* case of discrimination." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019). If the plaintiff makes such a showing, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221 (citing *Tex. Dep't of*

---

[6] While Stevenson does allege, in a conclusory manner, that her race and sex were "motivating factor[s]," *see* Compl. ¶¶ 49, 67, "a plaintiff cannot make only a passing reference to a mixed-motive theory to sufficiently raise the issue." *Smith v. Vestavia Hills Bd. of Educ.*, 791 F. App'x 127, 130 (11th Cir. 2019) (internal quotations and citation omitted).

*Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination.'"  *Id.* (quoting *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 256).

### B.  *Prima Facie Case of Discrimination*

Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of discrimination by showing: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably."  *Id.* at 1220–21.  Here, the City only challenges the fourth element of Stevenson's *prima facie* case regarding similarly situated employees.  After carefully reviewing the evidence in the light most favorable to Stevenson, she has established a *prima facie* case of discrimination only as to the City's alleged failure to assign her trainees after she applied to be an FTO—not by singling her out for taking bathroom breaks.  The Court will address each allegation in turn.

### i.  *FTO Assignments*

In its Motion, the City claims Stevenson cannot show it treated "similarly situated employees" outside of her protected class more favorably because the City did not assign trainees to "two other City police officers—Megan Santana (a <u>white</u> female) and Eric Carter (a biracial <u>male</u>)[.]"  Mot. at 4 (emphasis in original).  The problem with this argument is that Stevenson is a *black female*.  If we shift the City's emphasis, these two individuals are still in Stevenson's protected class—Megan Santana (a white <u>female</u>) and Eric Carter (a <u>biracial</u> male).  The only officers who attended the training program with Stevenson and were ultimately assigned trainees were white and Hispanic males.  Resp. at 7; Pl's. Resp. to Def's. SOMF ¶ 11.  Viewing the record in the light most favorable to Stevenson, she and the other officers were "similarly situated" as she

had the most years of experience as a police officer with the City.  Resp. at 6–7; Pl's. Resp. to Def's. SOMF ¶¶ 11–12.  This is sufficient to satisfy the fourth element.  *See Lewis*, 918 F.3d at 1224 (holding "plaintiff must show that she and her comparators are 'similarly situated in all material respects'"); *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1288 (11th Cir. 2018) (noting plaintiff need only show that "her employer treated similarly situated employees outside her classification more favorably").  Therefore, as the City only challenges the fourth element under *McDonnell Douglas*, Stevenson has established a *prima facie* case of discrimination as to the FTO assignments.

### ii.  Bathroom Breaks

In addition to not receiving trainees after applying to be an FTO, Stevenson alleges that she "again experienced discrimination by [the City] when she was singled out for taking bathroom breaks, required to report her breaks, and required to procure a doctor's note explaining her need for bathroom breaks during her menstrual cycle."  Compl. ¶¶ 48, 66.  However, Stevenson completely ignores this alleged act of discrimination in her Response.  *See* Resp. at 5–7.  Perhaps this is because there is no record evidence to make out a discrimination claim on this basis.

By Stevenson's own account, she was not "singled out" because of her race or sex; her supervisors confronted her about being unavailable to respond to a dispatch—with no mention of her menstrual cycle.  *See* Stevenson Dep. at 89–96.  Instead, after not responding to the dispatched call, Stevenson was asked to return to the police station.  *Id.* at 90:22–24, 91:1–5.  When she arrived at the station, Lieutenant Visners said "[y]ou were home . . . I'm tired of you—you know, you should have taken that call, but you were home."  *Id.* at 93:18–20.  Stevenson then "explained to him that [she] was using the toilet[,]" and Lieutenant Visners responded "[w]ell, you weren't home? . . . Well, it's always something with you, you know, every time they ask you to do something."  *Id.* at 94:4–9.  Stevenson told him "I'm a woman.  I'm entitled to use the restroom."  *Id.* at 94:14–15.  Lieutenant Visners ended the conversation by telling Stevenson that "if you have

a problem[,] . . . you need to go to Human Resources and get accommodations, and for now you need to get on the radio and you need to advise every time you're gonna leave your zone and go to the bathroom." *Id.* at 95:15–16, 20–24.

Under no theory, including a hostile working environment[7] theory, could these facts sustain a claim for race or sex discrimination.  As relayed by Stevenson, Lieutenant Visners was concerned about Stevenson's availability, brought it up immediately after Stevenson failed to respond to a dispatch, learned that Stevenson had been on a bathroom break, and then advised her that she needed to get an accommodation if she had "a problem"—clearly a reference to any potential medical issues—and would need to let dispatch know when she would be unavailable.  Stevenson offers no evidence to show that she was treated any differently than those outside her protected class.  In fact, Stevenson testified that all officers are supposed to advise when they are on bathroom breaks.  *See id.* at 87:24–25, 88:1-2 ("Q.  What does 10-6 mean for the record?  A.  It's what officers do if they're in the bathroom . . . . it's not abnormal to say you're 10-6 personal[.]").  Therefore, the City is entitled to summary judgment on Stevenson's discrimination claims based on her being confronted about bathroom breaks.

### C.  Nondiscriminatory Reasons and Pretext

Given Stevenson's showing of a *prima facie* case as to the FTO assignments, "the burden shifts to the [City] to articulate a legitimate, nondiscriminatory reason for its actions."  *Lewis*, 918 F.3d at 1221 (citing *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 253).  Importantly, "[b]ecause the employer's burden is one of *production*—not persuasion—the employer 'need not persuade the court that it was *actually* motivated by the proffered reason[.]'"  *Kidd*, 731 F.3d at 1205 (emphasis in original) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)).

---

[7]  To prove a hostile work environment claim, an employee must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Smelter*, 904 F.3d at 1284.  Here, this is clearly not the case given this single incident.

The City's reason "need only be specific enough so that the plaintiff is afforded a full and fair opportunity to demonstrate pretext." *Id.* (citation and internal quotations omitted).

The City states it did not assign trainees to Stevenson because of her "significant disciplinary history and internal affairs history, apathetic attitude, consistent utilization of sick time, departmental concerns regarding reliability and accountability, and because she did not possess as strong of a work ethic as other eligible officers."[8] Mot. at 6. For support, the City has produced sworn declarations from the FTO program administrators, Chief of Police, and Stevenson's direct supervisor; the deposition testimony of the sergeant who oversaw the FTO program; Stevenson's yearly evaluations; and other documentary evidence. *See* City's App. in Support of Summ. J. Mot. [ECF No. 40]. After reviewing the evidence, the City's proffered reasons are legitimate, nondiscriminatory reasons, specific enough so that Stevenson is afforded a full and fair opportunity to demonstrate pretext. Thus, the City has met its burden of production.

Stevenson bears the burden to introduce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Kidd*, 731 F.3d at 1205 (citation omitted). To show pretext, an employee must confront the employer's seemingly legitimate reason for not promoting her "head on and rebut it." *Id.* at 1206 (citation and internal quotations omitted). The plaintiff "cannot succeed by simply quarreling with the wisdom of that reason." *Id.* (citation and internal quotations

---

[8] Stevenson states that the City initially told her she did not receive trainees because her traffic stops were too low. *See* Stevenson Dep. at 55:1–2. The City denies this. Reply at 6 n.7. As such, Stevenson argues that the City has "shift[ed] explanations," which Stevenson contends is evidence of pretext. Resp. at 9. The Court disagrees. Stevenson testified that she asked Lieutenant Visners why she was not assigned trainees and he told her "I was rooting for you but your traffic stops are too low." Stevenson Dep. at 54:21–25, 55:1–2. Even if true, Lieutenant Visners was only one of four decision-makers involved in the City's FTO selection process. *See* Castro Dec. ¶ 9. The City has maintained throughout this litigation that Stevenson was not assigned trainees for multiple reasons. Reply at 6 n.7. At most, Lieutenant Visners' brief statement is evidence of an additional reason Stevenson was not given trainees—it is not evidence that it was the sole reason considered by the entire group of FTO decision-makers. In fact, there is no evidence that any of the other FTO decision-makers based their decision not to assign Stevenson trainees on her traffic stops. Ultimately, whether Stevenson's potentially low traffic stops were one of the City's multiple nondiscriminatory reasons for its action is irrelevant to Stevenson's ability to establish pretext.

omitted).  A plaintiff may demonstrate that an employer's reasons were pretextual by "revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (citation and internal quotations omitted).  Critically, "[a] reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (internal quotations omitted).

Here, Stevenson attempts to establish pretext as to the City's proffered reasons by arguing that per the City's Policy, she "would not [] have been allowed to proceed to the state-certified training program as a 'selected' officer if her alleged disciplinary background and performance had disqualified her application."  Resp. at 8.  Essentially, Stevenson contends that the City's Policy proves that her background was considered *before* she attended the FTO training program and therefore, the City's proffered reasons are pretextual.  This argument makes two faulty assumptions for which there is no record evidence: (1) that the City's policy actually states that an officer's application is always considered *before* that officer is able to attend a state-certified training course and (2) that Stevenson was "selected" by the City as an FTO before the City's decision not to assign trainees to her.

First, the City's Policy merely states that an officer must attend a state-certified training program if they are selected to be an FTO, not that an officer may *only* attend *if* they have been selected.  *See* City's Policy at 7 ("Upon being selected, FTOs must attend a state certified FTO training program."); *see also* Castro Dec. ¶ 7 ("[T]he mere fact that an officer attends and completes the state-certified training program does not automatically guarantee that the officer will be assigned trainees at the City or otherwise be known as an 'Active FTO.'").  Further, the

record evidence shows that the City does not prevent its officers from attending the state's FTO training program while their application is being considered. As the City's FTO coordinator, Sergeant Castro, states in his declaration, "[s]o long as schedules permit, the City does not prevent any of its officers from attending the state certified training program." *See* Castro Dec. ¶ 6. To the contrary, he continues, "the City encourages all of its officers to attend the training program because it provides an opportunity for the officers to learn leadership and management skills." *Id.* Stevenson points to no evidence in the record to show otherwise. In fact, it is undisputed that two officers in addition to Stevenson also attended the state-certified training program and were ultimately not assigned trainees. *See* Def.'s. SOMF ¶ 10.[9]

Second, there is no evidence for a reasonable fact-finder to conclude that Stevenson was ever actually selected by the City as an FTO. To show that she was "selected," Stevenson relies on an email from Sergeant Michael Broksch.[10] Stevenson Dec. ¶ 8; Resp. at 9. The email from Sergeant Broksch (someone uninvolved in the City's FTO selection process) simply stated "*I was told* you're in. *Wait* until Sgt. Anderson reaches out to you." Exhibits to Resp. [ECF No. 46-4]

---

[9] Stevenson states that "Megan Santana (white female) and Eric Carter (black male) did not meet the criteria based on their application to become FTOs[.]" Pl's. Resp. to Def.'s SMOF ¶ 10. This "fact" demonstrates the opposite of what Stevenson intends. According to Stevenson, Officers Santana and Carter did not meet the FTO criteria based on their applications, yet both officers attended the state-certified training program. This *supports* the City's assertion that it does not prevent its officers from attending the state-certified training course while their applications are being considered.

[10] In her Response, Stevenson also asks "[w]hy did [the City] allow her to attend FTO meetings, schedule her to attend the state-certification course and order her FTO apparel, evidencing her selection to the position?" Resp. at 9. These rhetorical questions are not evidence of Stevenson's "selection to the position." The same questions could be asked in reverse—why would the City do all of this for Stevenson if it was discriminating against Stevenson on the basis of her race and sex? Regardless, the record is clear that the City's FTO meetings are informational and open to all interested officers. Second Louis Castro Dep. [ECF No. 46-3] ("Castro Dep. 2") at 87:11–12; Castro Dec. ¶ 7. It is undisputed that the sign-in sheets include the names of non-FTO officers. *See* Exhibits to Resp. [ECF No. 46-4] ("Exhibits") at 25–26. As discussed above, the City allows any officer to attend the state-certified training course. The FTO coordinator, Sergeant Castro, testified that he helps all interested officers register for the class. Castro Dep. 2 at 96:24–25, 97:1. Stevenson offers no evidence to dispute this. As for the "FTO apparel," the context of the email from Sergeant Castro makes clear that this is simply a shirt for officers to wear while attending the class. *See* Exhibits at 45 ("Subject: FTO Class & T-shirt").

("Exhibits") at 27 (emphasis added).  To the extent this email would be admissible at trial, it stops short of showing that Stevenson was selected by the City to be an FTO.  There is no evidence that Stevenson ever received confirmation from anyone at the City, let alone specifically from "Sgt. Anderson," that she had been selected as an FTO and/or the only thing that she needed to do was attend the state-certified training course.  When asked directly "did anyone at the City ever tell you that upon completion of this process you actually will be indeed a field training officer?" Stevenson answered, "I don't recall."  Stevenson Dep. at 44:18–21.

In sum, the City's Policy does not establish that the City's legitimate, nondiscriminatory reasons for its actions are pretextual.[11]  Thus, Stevenson must confront the City's proffered reasons "head on and rebut [them]."  *Kidd*, 731 F.3d at 1206.  "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."  *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007) (citation omitted).  Again, the City states that it did not assign trainees to Stevenson because of her "significant disciplinary history and internal affairs history, apathetic attitude, consistent utilization of sick time, departmental concerns regarding reliability and accountability, and because she did not possess as strong of a work ethic as other eligible officers."  Mot. at 6. Stevenson has failed to rebut *any* of the City's proffered reasons.

### i. Disciplinary and Internal Affairs History

It is undisputed that Stevenson has a lengthy disciplinary and internal affairs history.  Def's. SMOF ¶¶ 14–15.  In an attempt to establish pretext, Stevenson asserts that "several [other] FTOs had internal affairs investigations and they were assigned trainees."  Pl's. Resp. to Def's. SMOF ¶

---

[11]  The Court notes that even if the City's policy operated as Stevenson claims, "[t]he mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."  *Springer*, 509 F.3d at 1350 (emphasis in original) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)).

14.  For this proposition, Stevenson relies on the testimony of Sergeant Castro.  *Id.*  However, Sergeant Castro made clear that the officers who became FTOs despite prior internal affairs investigations were only investigated for minor incidents such as traffic accidents.  *See* Second Louis Castro Dep. [ECF No. 46-3] ("Castro Dep. 2") at 100–06.  In sharp contrast, Stevenson has been investigated or otherwise disciplined for:

> (a) twice failing to properly search a prisoner while making an arrest; (b) failing to initially document and author an incident report after she found a one year old child wandering in the roadway after escaping a caretaker's house; and (c) violating departmental policy in her handling of an incident involving her nephew fighting at a local basketball court.

Def's. SOMF ¶ 14.  Stevenson has also been investigated for a domestic dispute with her husband that resulted in her being arrested and charged with battery and disorderly conduct.  *Id.* at ¶ 15. The serious nature of Stevenson's disciplinary and internal affairs history cannot be fairly compared to traffic accidents.  Castro Dep. 2 at 113:6–11 ("Q.  Is it fair to say that being arrested is more egregious than a car accident and therefore more likely to disqualify an officer from receiving trainees? . . . A.  100 percent.").  Moreover, the "nature of a particular internal affairs investigation," plays a factor in the decisions to assign trainees.  *Id.* at 112:18–22.

Instead of rebutting this history, Stevenson confirmed her disciplinary record in her deposition testimony.  *See* Stevenson Dep. at 78:16–20, 81:16, 83:7-9, 18-20, 85:9–12, 19–20, 86:2–3 ("Q.  All right.  Were you ever investigated for failing to properly search a prisoner making an arrest?  A.  I was.  There were two incidents with that one . . . .  Q.  Was there ever an incident where you were investigated for a negative remark associated with you failing to document that you found a one-year old child wandering in traffic?  A.  Yes . . . .  Q.  Was there an investigation done with respect to that domestic violence incident?  A.  Yes . . . . Q.  Did you agree with that? A.  Well, I shouldn't have gotten into an argument with my ex-husband, you know, so . . . .  Q.  In February of 2014 were you suspended as a result of you being involved in an incident with your

nephew at a basketball court?  A.  Was I suspended?  Yes, I was. . . . Q.  Did you believe that you handled the situation appropriately?  A.  . . . in retrospect, I probably should have called a supervisor.").   Clearly, Stevenson's disciplinary and internal affairs history qualifies as a legitimate, nondiscriminatory reason for the City to not assign her trainees.  As Stevenson has failed to rebut this history, she cannot establish pretext.

### ii.  Concerns Regarding Apathetic Attitude, Reliability, Accountability, and Work Ethic

Next, Stevenson asserts that she "never had an apathetic attitude, . . . failed to be reliable or accountable, or failed to possess a strong work ethic."  Stevenson Dec. ¶ 11.  For support, Stevenson points to her 2015 and 2016 yearly evaluations which "said that [Stevenson] was an 'above average' police officer."  Resp. at 8–9.  While this is true, Stevenson confirms that one of her direct supervisors, Sergeant Patrizi, informed her that her fellow officers "were complaining that [she] [wasn't] pulling [her] weight."  Stevenson Dep. at 112:21–22.  She further testified that she asked Sergeant Patrizi to let her know who the officers were because "this is not the first time somebody[] came to [her] with this 'you're not pulling your weight.'"  Id. at 113:1–2.  Indeed, Sergeant Patrizi states in his declaration that he "noticed a pattern of [Stevenson] not being efficient in her work and spoke to her about this."  Decl. of Jimmy Patrizi [ECF No. 40-7] ("Patrizi Dec.") ¶ 7.  He also states that he "received complaints from [Stevenson's] fellow officers about [her] availability, accountability and reliability, and these officers' issues with [Stevenson] responding to calls in a timely and effective manner."  Id.

Moreover, the City had to remove Stevenson from a security detail at Franklin Academy because "[p]arents complained about [Stevenson's] traffic control at the school and they had overheard [Stevenson] complaining about the school's parents and classifying the parents as difficult and complainers."  Def.'s SOMF ¶¶ 16–17.  This is confirmed by the email from the

school relaying these complaints.  Email from Danielle Ockman to Robert Voss [ECF No. 40-11] ("Franklin Academy Email").[12]

Simply put, the two yearly evaluations stating that Stevenson was an "above average" police officer do not sufficiently rebut the evidence that the City received complaints and had concerns about Stevenson's apathetic attitude, reliability, accountability, and work ethic. Therefore, Stevenson has also failed to establish that this reason was pretextual.

### iii.  Consistent Utilization of Sick Time

Lastly, Stevenson states that she has "never . . . consistently utilized sick time[.]" Stevenson Dec. ¶ 11.  But this assertion is directly contradicted by the record.  Stevenson's yearly evaluations from the relevant time period note that she received a "satisfactory" for attendance due to utilization of sick time and state that she should "try to improve her sick time usage."  Exhibits at 5–8 (2015 and 2016 Evaluations); see also 2017 Employee Performance Evaluation [ECF No. 40-12] ("2017 Evaluation") ("Officer Stevenson should attempt to minimize her usage of sick time"); 2018 Employee Performance Evaluation [ECF No. 40-17] ("2018 Evaluation") (same). Thus, a reasonable fact-finder could never conclude that Stevenson has sufficiently rebutted this proffered reason.  And of course, Stevenson's consistent utilization of sick time qualifies as a legitimate, nondiscriminatory reason for the City to not assign her trainees.  As Sergeant Castro explained, the FTO program administrators consider an applicant's utilization of sick time because—as expected—FTOs "have to be at work to train."  Castro Dep. 2 at 113:13–21.

---

[12]  Stevenson does not dispute that the City received these complaints from Franklin Academy, but she suggests that the complaints from Franklin Academy were "discriminatory" because "[o]f the approximately 25 officers that were assigned to the school, the school wanted only [Stevenson] and the other Black officer removed."  Stevenson Dec. ¶ 9; see also Pl's. Resp. to Def's SOMF ¶¶ 16–17.  However, Stevenson offers no evidence for her suggestion that the complaints were "discriminatory."  In fact, the record evidence demonstrates the exact opposite.  The email from Franklin Academy shows that the school asked only for Stevenson's removal—not, as Stevenson stated, for her "and the other Black officer [to be] removed."  See Franklin Academy Email.  Stevenson herself testified that the other black officer was not removed from the Franklin Academy detail, but instead was on maternity leave.  Stevenson Dep. at 77:9–11 ("Q. Was Otisha removed as well?  A.  She was on -- she was pregnant so she didn't have to be removed at that time.").

Plainly, Stevenson disagrees with the City's explanation for why she was not assigned trainees, but "a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (citation and internal quotations omitted). All of the City's proffered reasons could motivate a reasonable employer to find that Stevenson is not the best candidate to train young police officers. *See, e.g.*, *Denney v. City of Albany*, 247 F.3d 1172, 1186 (11th Cir. 2001) (citation and internal quotations omitted) ("Personal qualities . . . factor heavily into employment decisions concerning supervisory or professional positions. Traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position.").

Federal courts "do not sit in judgment of the wisdom of an employer's selection." *Springer*, 509 F.3d at 1350. As Stevenson has failed to establish that any of the City's proffered reasons were "false, *and* that discrimination was the real reason," Stevenson cannot show pretext and, therefore, the City is due summary judgment on Stevenson's discrimination claims. *Brooks*, 446 F.3d at 1163 (emphasis in original); *see also Springer*, 509 F.3d at 1350 (affirming summary judgment where plaintiff failed to "satisfy her burden of proving that [employer's] proffered reason for not promoting her was a pretext for discrimination").

## II. Retaliation Claim

In addition to prohibiting discrimination, Title VII prohibits retaliation against an employee for the employee's opposition to "any practice made an unlawful employment practice by Title VII." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing 42 U.S.C. § 2000e–3(a)). As with Title VII discrimination claims, courts "analyze retaliation claims that are based on circumstantial evidence according to the *McDonnell Douglas* burden shifting framework." *Smelter*, 904 F.3d at 1293. A plaintiff must establish a *prima facie* case of retaliation, which shifts

the burden to the defendant "to produce legitimate reasons for the adverse employment action[,]" and, "[i]f the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (citation and internal quotations omitted).

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012) (citation and internal quotations omitted). Stevenson bases her retaliation claim on allegedly being "harassed, passed over for FTO assignments[,] suspended for voicing her complaints[,] [and] . . . receiv[ing] lowered performance evaluations." Compl. at ¶ 83; *see also id.* at ¶¶ 88, 93, 98. The City is entitled to summary judgment on all four grounds and the Court will address each in turn.

### A. Harassment

Stevenson argues that she "suffered a retaliatory environment following her several complaints of discrimination." Resp. at 12. Specifically, Stevenson asserts that "[t]he retaliatory scheme included heightened scrutiny, maligning [Stevenson] in front of her co-workers, encouraging complaints about [Stevenson], creating and enforcing rules against [Stevenson] that others were not subject to, and threatening [Stevenson] with disciplinary action." *Id.* However, Stevenson fails to cite any support in the record for these conclusory allegations. *Id.* And of course, "mere conclusory allegations and assertions will not suffice to create a material issue of fact to defeat [a] well supported summary judgment motion." *Haynes v. JP Morgan Chase Bank, N.A.*, 466 F. App'x 763, 766 (11th Cir. 2012) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)) (internal quotations omitted). Thus, summary judgement in favor of the City is warranted on Stevenson's retaliation claim based on harassment.

### B.  FTO Assignments

Even assuming that Stevenson could show a *prima facie* case of retaliation based on being denied FTO trainees, as discussed above, Stevenson cannot establish that the City's legitimate, nondiscriminatory reasons are pretextual.  *See Smelter*, 904 F.3d at 1293 (holding that where a plaintiff fails to show pretext as to a discrimination claim, "that conclusion applies with equal force to [that plaintiff's] retaliation claim" based on the same employer conduct).  Thus, summary judgement in favor of the City is warranted on Stevenson's retaliation claim based on being denied FTO trainees.

### C.  Suspension

In her Response, Stevenson makes no mention of allegedly being "suspended for voicing her complaints."  *See* Resp. at 11–12.  Nevertheless, the record is clear that Stevenson's suspension at the end of 2017 was a result of her having an anxiety attack during a meeting—not a result of her voicing complaints.  Def's SOMF ¶¶ 20–21.  As then-Chief of Police, John E. Brooks, states in his declaration, "I was advised via the chain of command that [Stevenson] abruptly walked out of a staff briefing and was transported by Fire Rescue to a local hospital at her request."  Decl. of John E. Brooks [ECF No. 40-6] ("Brooks Dec.") ¶ 6.  He explains that he "subsequently placed [Stevenson] on administrative leave at the recommendation of the chain of command and after consultation with Human Resources and Risk Management."  *Id.*  Chief Brooks states that he also "ordered [Stevenson] to undergo a fitness for duty evaluation."  *Id.*  Stevenson offers no evidence to show that her anxiety attack was not the true reason for her suspension, but confirms that she was diagnosed with anxiety at the hospital.  Stevenson Dep. at 122:21–23.  Accordingly, the City is entitled to summary judgement on Stevenson's retaliation claim based on her suspension.

### D.  Lowered Performance Evaluation

Stevenson argues that her "lowered" 2018 yearly performance evaluation, which rated her overall performance "satisfactory," constitutes an adverse employment action because "she is now

barred from participating in the FTO program[.]"  Resp. at 11.  However, this argument is misplaced.  The decision to not assign trainees to Stevenson was made, at the latest, in June or July of 2017—over a year before Stevenson's 2018 evaluation.  *See* Stevenson Dec. ¶ 10; Def's. SOMF ¶ 29.  Thus, the City had already decided that Stevenson was not fit to be an FTO for multiple reasons.  *See supra* Section I.C.  Her 2018 evaluation would have no bearing on these reasons.  Additionally, it is undisputed that there was no change in Stevenson's pay, job duties, or position following her 2018 evaluation.  Def's SOMF ¶ 31.

Regardless, even if Stevenson's 2018 evaluation could be considered an adverse employment action, she offers no evidence to show the required causal connection.  To establish a causal connection, a plaintiff must show that the relevant decisionmaker was "aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated."  *Shannon*, 292 F.3d at 716.  Stevenson filed her charge of discrimination (the latest example of protected activity before Stevenson's 2018 evaluation) with the FCHR on November 22, 2017.  Def's. SOMF ¶ 23.  Sergeant Patrizi, the relevant decisionmaker, authored Stevenson's 2018 evaluation on September 20, 2018.  *See* 2018 Evaluation.  Sergeant Patrizi states that he "was not even aware of [Stevenson's] November 2017 Charge of Discrimination when [he] evaluated her in September 2018."  Patrizi Dec. ¶ 8.  Stevenson points to no evidence to show otherwise.  Further, while "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action[,]" the 10-month gap here fails as a matter of law.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (finding 3-month gap insufficient to show causation).

Stevenson also cannot show that "the protected activity and the adverse actions were not wholly unrelated."  *Shannon*, 292 F.3d at 716.  As discussed herein, Sergeant Patrizi had legitimate, independent reasons for finding Stevenson's performance to be "satisfactory."  *See supra* Section I.C.ii.  For example, as Stevenson confirmed, Sergeant Patrizi received complaints

about Stevenson from her fellow officers. *See* Stevenson Dep. at 112:21–22. Sergeant Patrizi also states in his declaration that he "noticed a pattern of [Stevenson] not being efficient in her work and spoke to her about this." Patrizi Dec. ¶ 7. Moreover, during the time period covered by Stevenson's 2018 evaluation, the City had to remove her from a security detail at Franklin Academy due to complaints from parents. Def's. SOMF ¶¶ 16–17; *see also* Franklin Academy Email. Consequently, Stevenson cannot show the required causal connection. Thus, the City is due summary judgement on Stevenson's retaliation claim based on her 2018 evaluation as well.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court concludes that the City is entitled to summary judgment on each of Stevenson's claims. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that the City's Motion for Summary Judgment [ECF No. 38] is **GRANTED** and the City's Motion in Limine [ECF No. 56] is **DENIED** *as moot*. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, final judgment will be entered by separate order.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 13th day of May, 2020.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**